# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                       No. CR 04-2537 JB/MCA

VICTOR MANUEL TORRES-CASTRO,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's Motion to Suppress Evidence and Supporting Memorandum filed on February 8, 2005 (Doc. 15). The Court held an evidentiary hearing on this Motion on February 25, 2005. The primary issues are: (i) whether the protective sweep of Defendant Victor Manuel Torres-Castro's residence was incident to his arrest; and (ii) whether the Court must suppress the evidence and statements that the officers subsequently obtained as "fruit of the poisonous tree." Because the Court concludes that the protective sweep's unlawfulness did not taint Torres-Castro's voluntary statements or consent to search the residence for weapons, the Court will deny Torres-Castro's motion.

## FINDINGS OF FACT

1.      At approximately 12:30 a.m. on December 2, 2004, Officer Dan Phel of the Albuquerque Police Department ("APD") encountered a juvenile running down Central Avenue in Albuquerque, New Mexico. See Transcript of Hearing at 4:10-20 (taken February 25, 2005).[1]

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any finalized transcript may contain slightly different page and/or line numbers.

2.      Phel observed that the juvenile[2] appeared upset, scared, and out of breath from running.  See Transcript of Hearing at 5:7-10.

3.      During the officer's initial encounter with the juvenile, the juvenile provided the officer with the following information:

      a.      her boyfriend was chasing her;

      b.      her boyfriend was going to beat her;

      c.      her boyfriend was over 20 years old;

      d.      she was 14 years old;

      e.      she did not live in the area; and

      f.      her parents did not know what was going on.

See Transcript of Hearing at 4:20 - 5:6.

4.      Upon receiving this information, the officer took the juvenile to the police substation and called her parents.  See Transcript of Hearing at 5:11-24.

5.      While waiting for the juvenile's mother to arrive and pick her up from the substation, the officer obtained the following additional information from the juvenile:

      a.      her boyfriend was Victor Torres-Castro;

      b.      her boyfriend was an illegal alien and had been deported once before;

      c.      her boyfriend had engaged in sexual intercourse with her;

      d.      her boyfriend had a gun;

---

[2] Phel knew the juvenile's name but the Court will not disclose it in this Memorandum Opinion and Order for privacy reasons.  See 18 U.S.C. § 3509(d)(1) (requiring confidentiality of information regarding the name of a child alleged to be the victim of a crime of physical abuse, sexual abuse, or exploitation).

     e.     her boyfriend had beaten her a few times in the past, and when she tried to leave her boyfriend in the past, he would lock her up or hit her; and

     f.     her boyfriend would not allow her to contact her family or friends, and had threatened to shoot anyone who attempted to take her away.

See Transcript of Hearing at 5:25 - 7:5; 8:6-9.

6.     While at the police substation, the juvenile also was able to provide Torres-Castro's birth date and identify him from a photograph that Phel retrieved from police records, which allowed Phel to verify Torres-Castro's age and become familiar with his appearance.  See Transcript of Hearing at 7:2-7.

7.     Phel also verified the juvenile's age by reviewing her school identification card and questioning her mother when she arrived at the substation.  See Transcript of Hearing at 7:8-12.

8.     The juvenile's mother told the officer that the juvenile was having a relationship with Torres-Castro and that she tried to keep him away from the juvenile but had not been successful in doing so.  She also explained that she was in the process of attempting to get a restraining order against Torres-Castro to prevent him from taking the juvenile.  See Transcript of Hearing at 7:18 - 8:5.

9.     Based on the information that he obtained from the juvenile, her mother, and police records regarding Torres-Castro, Phel decided to conduct an investigation at Torres-Castro's residence.  See Transcript of Hearing at 8:10 - 9:8.

10.     At approximately 7:00 p.m. on December 4, 2004, Officer Phel and two other APD officers (Elder Guevara and Mark Elrick) went to a residence identified as "301 General Chenault" in Albuquerque, New Mexico.  Phel briefed the other officers on his investigation before their arrival,

including the juvenile's allegations that Torres-Castro had a gun and had engaged in domestic violence.  See Transcript of Hearing at 8:10 - 10:1; 12:3-15; 26:17 - 28:9; 37:22 - 39:03.

11.     At the time the officers approached the residence, Phel had not formed the intention to arrest Torres-Castro and had not obtained an arrest warrant.  See Transcript of Hearing at 16:11-14; 18:7-15.

12.     The residence at 301 General Chenault is located in a neighborhood known to the officers as a high-crime area, where drugs and prostitution are present, and where the officers frequently receive calls for "shots fired."  See Transcript of Hearing at 8:23 - 9:2; 38:16-21.

13.     The residence at 301 General Chenault has a large picture window beside the front door and walkway, which was open with the lights on as Phel and Guevara initially approached the residence.  See Transcript of Hearing at 10:2-9; 17:16-23; 39:4-10.

14.     Looking through the front picture window, Phel and Guevara could see and identify Torres-Castro, along with several other unknown male individuals, seated in the living room. Guevara also observed that one of the individuals looked out of the window at the officers and then said something to the other occupants, whereupon some of them began walking toward the rear of the residence.  See Transcript of Hearing at 10:2-9; 39:4-15.

15.     After he made these observations through the window, Phel knocked on the front door of the residence, and Torres-Castro answered by opening the door.  See Transcript of Hearing at 10:10-17; 39:16-20.

16.     The officers were in uniform and did not draw their weapons or make any other show of force when Torres-Castro opened the door.  See Transcript of Hearing at 21:7-8; 23:10-21; 25:3-4; 33:8-18; 48:15-21.

17.     Phel then asked in English:  "Is it O.K. if we come in and have a word with you?"
Torres-Castro understood the officers' request and responded by saying: "Sure, come on in."  Under
the totality of the circumstances, Torres-Castro voluntarily consented to the officers' entry into the
residence.  See Transcript of Hearing at 10:18 - 11:07; 15:14-20; 39:16 - 40:6.

18.     The front door of the residence opened into a living room area, and upon receiving
Torres-Castro's permission to enter, Phel and Guevara walked into the living room of the residence,
with Elrick trailing behind them a few steps while the front door was still open.  See Transcript of
Hearing at 10:18 - 11:04; 22:17-19; 28:10-21.

19.     Upon entering the living room, Phel explained the purpose of his investigation and
asked Torres-Castro in English whether he knew the juvenile, what their relationship was, and
whether he knew the juvenile's age.  According to Phel, Torres-Castro responded that he knew the
juvenile, she was his girlfriend, and he knew how old she was.  See Transcript of Hearing at 11:8-14.

20.     While Phel was conversing with Torres-Castro in the living room, Torres-Castro was
not handcuffed or physically restrained.  See Transcript of Hearing at 23:10-21; 33:8-18; 48:2-21.

21.     When Phel first entered the residence and began conversing with Torres-Castro, the
officers noticed that some of the individuals they had previously seen through the picture window had
disappeared from view and were no longer in the living room.  See Transcript of Hearing at 11:14-
16; 17:24 -18:1.

22.     The officers also observed that there were other rooms in the residence, including a
front bedroom with a wall adjoining the living room, one or two back bedrooms, and a kitchen area
behind the living room.  The doors or entrances to these other rooms were open, and Elrick and

Guevara observed that some individuals were in plain view in one or more of the back rooms.  See Transcript of Hearing at 22:17-24; 28:22 - 29:22; 34:8 - 35:2; 40:7 - 43:19; 54:2-25.

23.     While Phel remained in the living room area with Torres-Castro, Guevara and Elrick conducted a brief "protective sweep" of the residence's other rooms and directed the individuals who had moved into the other rooms to return to the living room area and have a seat.  The officers identified themselves as police officers, but did not draw their weapons or make any show of force while conducting this protective sweep.  See Transcript of Hearing at 12:16 - 13:8; 23:16-21; 25:3-4; 28:22 - 29:22; 33:8-18; 40:19 - 43:19.

24.     Neither Torres-Castro nor any of the residence's other occupants resisted or objected to the officers' presence in the living room or any of the residence's other rooms.  The occupants were cooperative and assembled in the living room in accordance with the officers' request.  See Transcript of Hearing at 55:11-18.

25.     During the protective sweep of the front bedroom adjoining the living room area, Elrick saw a box of shotgun shells in plain view on a shelf in an open closet in the front bedroom. This open closet was adjacent to the door leading from the front bedroom to the living room area where Torres-Castro and other individuals were standing at the time.  Further, the door to that front bedroom was located directly around a blind corner that the officers could not see from their vantage point within the living room.  Thus, the shotgun shells in the open closet would have been within arms reach of a person standing in the threshold of the door to the front bedroom, directly around the blind corner from the living room.  See Defendants Exhibits 1, 2; Transcript of Hearing at 21:3-6; 29:9 - 30:5; 32:25 - 33:3; 42:16 - 43:19; 45:19 - 46:4.

26.     Elrick informed the two other officers of the presence of the shotgun shells, but did not remove them from the shelf in the closet and did not take them into the living room at that time.[3] Elrick then remained near the door to the front bedroom while the other officers spoke with the occupants in the living room area.  See Transcript of Hearing at 30:5 - 30:21; 32:19-24; 42:16 - 43:24; 45:25 - 46:4.

27.     The protective sweep also revealed that the juvenile was one of the occupants in the residence at the time.  She was found in the kitchen area.  A total of seven individuals were found in the residence:  five males and two females.   See Transcript of Hearing at 12:23 - 13:8; 31:14-16; 43:25 -  44:10.

28.     After assembling everyone in the living room, Guevara asked each of them in English and Spanish whether they had any weapons and whether they would consent to a search of the residence for weapons.  During this questioning, Guevara specifically advised Torres-Castro in Spanish that he did not have to answer.  See Transcript of Hearing at 13:13 - 14:4; 43:25 - 45:4.

29.     Guevara testified credibly that "officer safety issues" prompted his questioning about weapons, and he was not "conducting a particular criminal investigation."  Such officer safety issues preceded the shotgun shells' discovery and arose from the juvenile's report that Torres-Castro had a shotgun or some weapon, and had engaged in domestic violence.  Transcript of Hearing at 19:3-6; 38:3-21; 40:21 - 41:4; 45:5-13.

---

[3] Each of the officers' testimony was consistent on this point.  Defendant's testimony to the contrary is not credible.

30.     Phel testified credibly that he did not decide to arrest Torres-Castro based on the shotgun shells' discovery because Phel did not know that it was illegal for Torres-Castro to possess ammunition.  See Transcript of Hearing at 21:9-16.

31.     Both Torres-Castro and the officers used words such as "weapon," "firearm," "gun," and "shotgun" interchangeably in their testimony at the suppression hearing, and counsel also used these words interchangeably in their questioning.  Transcript of Hearing at 13:13 - 14:4; 19:3-6; 44:19 - 45:4; 45:19-23; 47:8-16; 58:19 - 59:3; 63:11 - 64:8; 65:3-6; 69-13-18.

32.     For example, Guevara testified that, in response to seeing the ammunition, he "asked every single person there if there w[ere] any weapons in the house."  Transcript of Hearing at 44:11-18.  When asked what he said to Torres-Castro about "searching for a firearm," Guevara testified that he said:  "Is there a shotgun in the house?  Where is the shotgun at?"  Id. at 44:19-22.  Guevara also testified that, before the protective sweep occurred, Phel told him of the juvenile's allegations that Torres-Castro had a "sawed-off shotgun" or a "shotgun" at his house.  Id. at 38:10-15.

33.     Guevara conducted his questioning of the residence's occupants in Spanish as well as English.  See Transcript of Hearing at 44:11-18; 48:22-25; 69:13-18.  According to Torres-Castro's testimony, he understood Guevara to be referring to the Spanish word "cuete," meaning "like a weapon."  See id. at 65:3-6.  Torres-Castro also used the words "weapon" and "shotgun" interchangeably in his testimony.  See id. at 58:19 - 59:3; 63:11 - 64:8; 65:3-6; 69-13-18.

34.     Torres-Castro answered Guevara's question in Spanish by stating that there was a shotgun located under a mattress in the front bedroom, and he gave his consent for the officers to search the residence for weapons.  Under the totality of the circumstances, Torres-Castro's statement

and his consent to search the residence for weapons were voluntary.  See Transcript of Hearing at 13:13 - 14:4; 44:19 - 45:4; 45:19 - 45:24.

35.     The other occupants also gave their consent for the officers to search the residence for weapons and remained cooperative with the officers.   See Transcript of Hearing at 44:11-18; 55:15-18.

36.     At some point after the officers assembled the occupants in the living room, the officers performed a brief pat-down search of each of the male occupants; however, the officers did not handcuff or physically restrain the occupants, and the officers did not draw their weapons.  See Transcript of Hearing at 13:13-19; 23:10-21; 25:3-4; 33:8-18; 48:15-21.

37.     After Torres-Castro identified the location of the shotgun and gave his consent to search the residence for weapons, Guevara proceeded to the front bedroom and looked under the mattress, where he saw a shotgun that appeared to have a barrel less than eighteen inches long. Guevara reported this information to the other officers, but did not remove the shotgun from under the mattress.  See Transcript of Hearing at 31:3-5; 44:23 - 47:19.

38.     A total of approximately five minutes had elapsed between the officer's entry into the residence and the discovery of the shotgun.  See Transcript of Hearing at 14:5-9; 24:3-10; 31:20 - 32:1; 48:7-14.

39.     Based on their training and experience, the officers knew that it is illegal to possess a shotgun with a barrel less than eighteen inches long.  Accordingly, they contacted Agent Francisco Ortega of the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), who responded that he was on his way to the residence and would be there in a matter of minutes.  See Transcript of Hearing at 14:10-12; 46:5 - 47:7.

40.     Shortly after discovering the shotgun, and while awaiting Ortega's arrival, Phel took Torres-Castro into one of the back bedrooms for further questioning outside the presence of the other occupants.   See Transcript of Hearing at 14:10-25;

41.     When Phel attempted to further question Torres-Castro in the back bedroom, Torres-Castro became uncooperative and stated that he did not understand Phel because he was speaking in English.   See Transcript of Hearing at 15:21 - 16:10; 20:6-11

42.     Phel then handcuffed Torres-Castro and kept him confined to the bedroom for a brief period until Ortega arrived.   See Transcript of Hearing at 23:4-15; 47:1-19.

43.     At the suppression hearing, Phel testified that he did not decide to arrest Torres-Castro until after the officers found the shotgun and took Torres-Castro into the back room for further questioning.  At that time, Phel decided to charge Torres-Castro with possessing an illegal weapon. Once the officers arrested Torres-Castro, Phel also charged him with sexual abuse of a minor and one other charge relating to his alleged mistreatment of the juvenile.  See Transcript of Hearing at 18:25 - 19:2; 20:6-11; 21:17-23; 23:4-15; 23:23 - 24:2; 24:14-23.

44.     Ortega arrived within five to ten minutes of being summoned by the APD officers. See Transcript of Hearing at 47:5-7.  When Ortega arrived on the scene, he advised Torres-Castro of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), before questioning him.  See Transcript of Hearing at 64:25 - 65:2; 72:9-11.

45.     According to Torres-Castro's motion, he made incriminating statements after his arrest and after he was advised of his Miranda rights.  See Defendant's Motion to Suppress Evidence at 3.

46.     At the suppression hearing on February 25, 2005, Phel, Elrick, and Guevara credibly testified as to the events and statements described above.

-10-

47.     Insofar as it conflicts with the findings listed above, Torres-Castro's testimony at the suppression hearing was not credible.

## PROCEDURAL BACKGROUND

A federal grand jury indicted Torres-Castro for possessing a sawed-off shotgun and for being an illegal alien in possession of a firearm.  Torres-Castro moves, pursuant to the Fourth and Fifth Amendment of the United States Constitution, and applicable federal case law, that the Court suppress the evidence found in his residence and any statements he made.  Torres-Castro contends that the evidence seized was the fruit of an illegal search and that the illegal search also tainted any statements he made.  Torres-Castro requested that the Court grant him an evidentiary hearing on this motion, and the Court held an evidentiary hearing on February 25, 2005.[4]

The United States opposes this motion.  At the suppression hearing on February 25, 2005, the Government presented the testimony of the three APD officers involved in Torres-Castro's arrest and the search of his residence.  Torres-Castro also testified at the suppression hearing in support of his motion.  At the conclusion of the hearing, the Court took the matter under advisement.

## STANDARD OF REVIEW

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule

---

[4] Torres-Castro requires the services of a Spanish-language interpreter at all hearings.  While his request for an interpreter during Court proceedings is a factor that the Court may take into account in determining the extent of his comprehension of the English language, see Valdez v. Ward, 219 F.3d 1222, 1231 (10th Cir. 2000), Torres-Castro's behavior and testimony during Court proceedings is subject to the Court's determination of credibility and, therefore, is not dispositive on this issue, see United States v. Pena, 920 F.2d 1509, 1513 (10th Cir. 1990).

12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See generally United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence except those with respect to privileges do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

## FOURTH AMENDMENT LAW

The Fourth Amendment protects Torres-Castro's right to be secure in his person and effects against unreasonable searches and seizures.[5]  For purposes of analyzing Fourth Amendment issues, the United States Court of Appeals for the Tenth Circuit has divided interactions between police and citizens into three categories:  consensual encounters, investigative stops, and arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See id.  Such encounters "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." Id.

For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call

---

[5] The Court does not address the Fourth Amendment rights of other occupants in the residence because Torres-Castro does not have standing to assert a claim on behalf of third parties in this context.  See Rakas v. Illinois, 439 U.S. 128, 133-34 (1978).  "It is immaterial if evidence sought to be introduced against a defendant was obtained in violation of someone else's Fourth Amendment rights."  United States v. Rascon, 922 F.2d 584, 586 (10th Cir.1990).

at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 Wayne R. LaFave, <u>Search and Seizure:  A Treatise on the Fourth Amendment</u> § 2.3(b), at 475 (3d ed. 1996).  Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." <u>Oliver v. Woods</u>, 209 F.3d at 1186.

 An encounter between a law-enforcement officer and a citizen is no longer consensual when there has been a show of official authority that would cause a reasonable person to believe he or she is not free to leave.  <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 502 (1983) (plurality opinion).  <u>Accord</u> <u>United States v. Maez</u>, 872 F.2d 1444, 1450 (10th  Cir. 1989).

> Courts have identified several factors that could lead a reasonable innocent person to believe that he is not free to disregard the police officer, including: the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

<u>United States v. Sanchez</u>, 89 F.3d 715, 718 (10th Cir. 1996).  <u>Accord</u> <u>United States v. Williams</u>, 356 F.3d 1268, 1274 (10th Cir.), <u>cert. denied</u>, 125 S. Ct. 264 (2004).  Similarly, an encounter at a person's residence is no longer consensual if the officer persists in the encounter after the homeowner directs him or her to leave, or otherwise indicates that the officer is not permitted on the homeowner's property. <u>See</u> <u>Rogers v. Pendleton</u>, 249 F.3d 279, 288-90 (4th Cir. 2001).

 The determination whether an encounter is no longer consensual "is based on how a reasonable person would understand the situation."  <u>United States v. Rogers</u>, 391 F.3d 1165, 1169 (10th Cir. 2004).  "This reasonable person 'does not have a guilty state of mind and does not have

peculiar mental or emotional conditions that are not apparent to the questioning officer.'"  Id.
(quoting United States v. Erving L., 147 F.3d 1240, 1247 (10th Cir. 1998)); see United States v.
Williams, 356 F.3d at 1275 (emphasizing that the "reasonable person" test presupposes an innocent
person).  The suspect's and the questioning officer's subjective state of mind "is wholly irrelevant and
plays no role in [the Court's] evaluation of the circumstances surrounding the encounter."  United
States v. Abdenbi, 361 F.3d 1282, 1292 (10th Cir.), cert. denied, 125 S. Ct. 197 (2004).  Thus, it is
a "critical error" for a district court to rely on the officer's or the suspect's subjective impressions.
See United States v. Rogers, 391 F.3d at 1170.

  An encounter that is not consensual may nevertheless be justified as an investigative detention.
An investigative detention occurs when an officer stops and briefly detains a person "'in order to
determine his identity or to maintain the status quo momentarily while obtaining more information.'"
Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).
Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must
meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First, the officer
"'must have a particularized and objective basis for suspecting the particular person stopped of
criminal activity.'"  Id. (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the
investigative detention that follows the stop must be "reasonably related in scope to the
circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968),
because the Fourth Amendment imposes "limitations on both the length of the detention and the
manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001) (en
banc).

-14-

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest. An arrest is a seizure that is "'characterized by highly intrusive or lengthy search or detention.'" Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest. United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994); accord Florida v. Royer, 460 U.S. at 499.

Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause. "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)). "[T]he standard of probable cause 'applie[s] to all arrests, without the need to "balance" the interests and circumstances involved in particular situations.'" Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) (quoting Dunaway v. New York, 442 U.S. 200, 208 (1979)).

While a determination of probable cause is to be based upon the totality of the circumstances, questions regarding the veracity, reliability, and basis of knowledge of witnesses remain "highly relevant." Illinois v. Gates, 462 U.S. 213, 230 (1983). The Court ordinarily assumes the crime victims' or crime-scene bystanders' veracity in making determinations of reasonable suspicion and of probable cause. See United States v. Blount, 123 F.3d 831, 835 (5th Cir. 1997) (en banc). Nevertheless, police officers "may weigh the credibility of witnesses" and are not required to believe one witness's testimony over that of another in making such a determination. Baptiste v. J.C. Penney

-15-

Co., 147 F.3d 1252, 1259 (10th Cir. 1998). Another relevant consideration regarding the probable-cause inquiry is whether officers have made a reasonable effort to "'interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of a warrantless arrest and detention.'" Id. at 1259 (quoting Romero v. Fay, 45 F.3d at 1476-77).

The probable-cause standard does "'not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams, 407 U.S. at 148-49). Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had probable cause to believe '*an* offense' had been committed." United States v. Edwards, 242 F.3d 928, 935 (10th Cir. 2001) (quoting United States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990)). Thus, for example, officers may have probable cause to believe that a suspect committed a robbery even though they do not yet know the identity of the victim, or officers may have probable cause to believe that property is stolen even though they do not yet know whether to charge the suspect with robbery or possession of stolen property. See id.

Probable cause is an objective standard, and thus the individual officer's subjective belief whether there is probable cause to arrest is not dispositive. See United States v. Davis, 197 F.3d 1048, 1051 (10th Cir. 1999) (citing Florida v. Royer, 460 U.S. at 507). Furthermore, "[t]hat an officer did not believe probable cause existed to detain a suspect does not preclude the Government from justifying the suspect's detention by probable cause." United States v. Santana-Garcia, 264 F.3d 1188, 1192 (10th Cir. 2001) (citing Florida v. Royer, 460 U.S. at 507).

-16-

Even when police officers have probable cause to support an arrest, the Fourth Amendment generally forbids the officers from making a warrantless, non-consensual entry into a suspect's residence to effectuate an arrest unless exigent circumstances are present.  See Payton v. New York, 445 U.S. 573, 590 (1980).  When officers are present in a residence with the occupant's knowing and voluntary consent, however, they may lawfully make an arrest of that occupant without obtaining a warrant so long as they have probable cause to support the arrest.  See United States v. Hampton, 260 F.3d 832, 835 (8th Cir. 2001) (collecting cases).

To prove that a defendant's consent to enter or search a residence was voluntary, it is the government's burden to show that there was no duress or coercion, that the consent was unequivocal and specific, and that the consent was freely and intelligently given.  See United States v. Drayton, 536 U.S. 194, 206-07 (2002); United States v. Rodriguez-Garcia, 983 F.2d 1563, 1567 (10th Cir. 1993).  The presence of uniformed officers bearing holstered weapons does not necessarily render a person's consent involuntary.  See United States v. Drayton, 536 U.S. at 204-05; United States v. Abdenbi, 361 F.3d at 1288.  Indeed, that police are actually detaining a person at the time they obtain a consent to search does not necessarily render his or her consent involuntary, see United States v. Rodriguez-Garcia, 983 F.2d at 1567, nor does it create a presumption that the consent to search is involuntary, see United States v. Price, 925 F.2d 1268, 1270-71 (10th Cir. 1991).  Rather, the court must consider the totality of the circumstances.  See United States v. Drayton, 536 U.S. at 207.

Incident to a lawful arrest in a residence, officers may also conduct a quick and limited "protective sweep" of the residence without the occupant's consent under certain circumstances.  See Maryland v. Buie, 494 U.S. 325, 327 (1990).  Like other forms of search incident to arrest or detention, the legal justification for a protective sweep is founded in legitimate concerns about the

-17-

safety of officers and others present at the arrest scene.  "The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter."  Id. at 333.  In particular, courts have recognized that such a risk may be present when officers arrest suspects in their own residence because "[o]fficers within the home of an arrestee may be particularly vulnerable to a dangerous confederate out of sight within the home."  United States v. Carter, 360 F.3d 1235, 1242 (10th Cir. 2004).  Further, "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings."  Maryland v. Buie, 494 U.S. at 333.

The Tenth Circuit has limited protective sweeps to arrest situations.  See United States v. Davis, 290 F.3d 1239, 1242 n.4 (10th Cir. 2002).  "A protective sweep . . . occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime."  Maryland v. Buie, 494 U.S. at 333.  Thus, a protective sweep must maintain a certain degree of spatial and temporal proximity to the arrest to fall within the scope of the doctrine articulated in Maryland v. Buie.

With respect to the spatial proximity to the place of arrest, officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  Maryland v. Buie, 494 U.S. at 334.  In some instances, courts have held that such areas may include not only the room in which the arrest takes place, but also adjoining rooms.  See, e.g., United States v. Lauter, 57 F.3d 212, 216-217 (2d Cir. 1995); United States v. Mendoza, 333 F. Supp. 2d 1155, 1160 (D. Utah 2004).

With respect to areas of the home that are not immediately adjoining the arrest and do not provide a launching site for an immediate attack, a protective sweep is not justified unless there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. at 334. Accord United States v. Cavely, 318 F.3d 987, 995 (10th Cir. 2003). In other words, officers must have a reasonable suspicion that such a dangerous individual is present to conduct this second category of protective sweeps. See Maryland v. Buie, 494 U.S. at 334.

With respect to a protective sweep's timing, the Supreme Court has stated that its scope is limited to a "cursory inspection of those spaces where a person may be found" that "lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335-36. The facts in Maryland v. Buie involved evidence seized during a protective sweep that police conducted after they had arrested the suspect. See id. at 328.

In related contexts, however, courts have applied the rule that, "[w]here the formal arrest followed quickly on the heels of the challenged search," it is not "particularly important that the search preceded the arrest rather than vice versa," so long as the officers are not relying on the evidence discovered during the search to establish probable cause for the arrest. Rawlings v. Kentucky, 448 U.S. 98, 111 (1980). See, e.g., United States v. Lugo, 170 F.3d 996, 1003 (10th Cir. 1999) (search of vehicle preceding arrest); United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998) (search of person preceding arrest); United States v. Smith, 389 F.3d 944, 951 (9th Cir. 2004) (search of vehicle preceding arrest); United States v. Han, 74 F.3d 537, 541 (4th Cir. 1996)

(search of person's bag preceding arrest).  "So long as an arrest that follows a search is supported by probable cause independent of the fruits of the search, the precise timing of the search is not critical."  United States v. Smith, 389 F.3d at 951.

The general rule in the Tenth Circuit is that:  "A warrantless search incident to arrest is valid so long as:  (1) there existed a legitimate basis for the arrest before the search;  and (2) the arrest took place shortly after the search."  United States v. Lugo, 170 F.3d at 1003 (citing United States v. Anchondo, 156 F.3d at 1045).  Under the second of these criteria, courts must inquire "whether the actual arrest was too remote from the search."  Id.

The court does not measure the search's remoteness by whether or by when the officers subjectively formed the intent to arrest the defendant for a particular offense.  See United States v. Anchondo, 156 F.3d at 1045.  The Supreme Court and the Tenth Circuit have both held that the defendant's and the officers' subjective intentions or state of mind are not relevant to determining whether a search or seizure is objectively reasonable under the Fourth Amendment.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001); United States v. Sanchez, 89 F.3d at 718.

Other circuits have stated that "the critical inquiry is whether the search is 'roughly contemporaneous with the arrest.'"  United States v. Smith, 389 F.3d at 951 (quoting United States v. McLaughlin, 170 F.3d 889, 892 (9th Cir. 1999)).  "The relevant distinction turns not on the moment of arrest versus the moment of the search but upon whether the arrest and search are so separated in time or by intervening acts that the latter cannot be said to have been incident to the former."  United States v. Abdul-Saboor, 85 F.3d 664, 668 (D.C. Cir. 1996).  Under this principle, a delay of three to five minutes between the arrest and the search does not necessarily preclude a

finding that the search was incident to the arrest, so long as the search and arrest are related in "a continuous sequence of events." United States v. Smith, 389 F.3d at 951.

## FIFTH AND FOURTEENTH AMENDMENT LAW

There are "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." Dickerson v. United States, 530 U.S. 428, 433 (2000). The Fifth Amendment inquiry applies to "the admissibility in evidence of any statement given during custodial interrogation of a suspect" and depends on whether the police provided the suspect with the four warnings that Miranda v. Arizona, 384 U.S. 436 (1966) requires. See Dickerson v. United States, 530 U.S. at 435. In these situations, the government generally bears the burden of proving that a defendant's waiver of his or her Miranda rights was knowing and voluntary. See United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997).

Under the Fifth Amendment, "[i]t is well established that police officers are not required to administer Miranda warnings to everyone whom they question." United States v. Erving L., 147 F.3d at 1246 (quotation omitted). The general rule is that police need give full Miranda warnings only when an individual is subject to "custodial interrogation," Miranda v. Arizona, 384 U.S. at 439, and a person is not "in custody" for Miranda purposes unless his "freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quotation omitted). Accord United States v. Rogers, 391 F.3d at 1169. Further, "'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. Rogers, 391 F.3d at 1171 (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).

-21-

There are, however, certain exceptions to this general rule.  For example, an investigative detention which falls short of an full custodial arrest may, under certain circumstances, prompt the need for <u>Miranda</u> warnings before police interrogate a suspect.  <u>See</u> <u>United States v. Perdue</u>, 8 F.3d 1455, 1463-65 (10th Cir. 1993) (concluding that police should have given a suspect <u>Miranda</u> warnings before interrogating him when they forced him out of his car and onto the ground at gunpoint).  On the other hand, there are circumstances in which self-incriminating statements made during custodial interrogation without the benefit of <u>Miranda</u> warnings may be admissible under the "public safety" exception articulated in <u>New York v. Quarles</u>, 467 U.S. 649 (1984).[6]

Apart from the Fifth Amendment standards articulated in <u>Miranda</u> and its progeny, a defendant may challenge the admissibility of a statement that police obtained on due-process grounds. <u>See</u> <u>Dickerson v. United States</u>, 530 U.S. at 434.  The due-process inquiry "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." <u>Id.</u> (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)).  "Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances and reviewed for clear error." <u>United States v. Zubia-Melendez</u>, 263 F.3d 1155, 1162 (10th Cir. 2001).  To meet its burden of proving that the defendant's consent was voluntary, the government must present clear and positive testimony that consent was unequivocal and specific and freely given without implied or express duress or coercion.  <u>See</u> <u>id.</u>  "This burden cannot be discharged by showing no more than

---

[6] In <u>New York v. Quarles</u>, the Supreme Court recognized a public-safety exception to the requirements of <u>Miranda v. Arizona</u> when police questioned a suspect about the whereabouts of a gun that the suspect had hidden in a store just before the police arrested him.  <u>See</u> <u>New York v. Quarles</u>, 467 U.S. at 655-56.

acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 548-49

(1968). Accord United States v. Leary, 846 F.2d 592, 598 (10th Cir. 1988).

## THE EXCLUSIONARY RULE

That a constitutional violation occurs does not necessarily mean that the Court must suppress

evidence obtained from a search or a suspect's statements.  "A party seeking exclusion of evidence

on Fourth Amendment grounds must demonstrate both actual police misconduct that violated the

defendant's Fourth Amendment rights, and that the evidence to be excluded was in fact a product of

the police misconduct." United States v. Williams, 356 F.3d at 1272 (citing United States v. DeLuca,

269 F.3d 1128, 1132 (10th Cir.2001) and United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th

Cir.2000)).  "'Only if the defendant has made these two showings must the government prove that

the evidence sought to be suppressed is not "fruit of the poisonous tree," either by demonstrating the

evidence would have been inevitably discovered, was discovered through independent means, or was

so attenuated from the illegality as to dissipate the  taint of the unlawful conduct.'" United States v.

DeLuca, 269 F.3d at 1132 (quoting United States v. Nava-Ramirez, 210 F.3d at 1131) (citations

omitted). See United States v. Williams, 356 F.3d at 1273 (citing Wong Sun v. United States, 371

U.S. 471, 487-88 (1963)).

"It is thus incumbent upon a defendant to demonstrate some affirmative link between the

police misconduct and the evidence obtained." United States v. Williams, 356 F.3d at 1272. "At a

minimum, a defendant must adduce evidence . . . showing the evidence sought to be suppressed

would not have come to light but for the government's unconstitutional conduct." United States v.

Nava-Ramirez, 210 F.3d at 1131.  In other words, a defendant invoking the "fruit of the poisonous

tree" doctrine "bears the burden of 'proving a factual nexus' between the Fourth Amendment

violation and the seizure of the evidence sought to be suppressed." United States v. King, 222 F.3d 1280, 1285-86 (10th Cir. 2000) (quoting United States v. Nava-Ramirez, 210 F.3d at 1131).

If the defendant meets this burden of showing both a Fourth Amendment violation and the requisite factual nexus to the evidence that he or she seeks to suppress, then the government may still avoid the evidence's suppression by demonstrating that one or more of the following doctrines apply. First, under the "independent source" doctrine, evidence discovered during an officer's initial, unlawful entry into private premises is not subject to suppression if the officer later lawfully obtained that evidence from another source that is "wholly unconnected with the initial entry." Murray v. United States, 487 U.S. 533, 535 (1988) (citing Segura v. United States, 468 U.S. 796, 813-14 (1984)). "The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." Nix v. Williams, 467 U.S. 431, 443 (1984).

Closely related to the "independent source" doctrine is the "inevitable discovery" doctrine. "When . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." Id. at 448. These two doctrines share a common rationale, namely that:

> "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred . . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation."

Murray v. United States, 487 U.S. at 537 (quoting Nix v. Williams, 467 U.S. at 443).

There is also a third exception to the exclusionary rule under which the court need not suppress the evidence if its connection with the unlawful search or seizure "had 'become so attenuated as to dissipate the taint.'" Brown v. Illinois, 422 U.S. 590, 598 (quoting Wong Sun v. United States, 371 U.S. at 491). In determining whether police obtain a confession by exploitation of an illegal arrest, courts generally examine not only whether the confession was voluntary and whether Miranda warnings preceded the confession, but also the "temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 603-04 (footnote and citations omitted). These factors may vary to some degree depending on the nature of the constitutional violation and the evidence at issue. See, e.g., United States v. Ceccolini, 435 U.S. 268, 280 (1978) ("[T]he exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object.").

Even if the court must suppress a defendant's statements under the above standards, it does not necessarily follow that the court must suppress nontestimonial evidence obtained as a result of those statements. For example, a failure to give Miranda warnings may render an otherwise voluntary statement inadmissible under the Self-Incrimination Clause of the Fifth Amendment, but the court may still admit the nontestimonial fruits. See United States v. Patane, 124 S. Ct. 2620, 2630 (2004) (plurality opinion). In addition, that a defendant initially gave a statement before the issuance of Miranda warnings does not necessarily require suppression of subsequent statements given after police issue such warnings and after the defendant has knowingly and voluntarily waived his or her Miranda rights. See Oregon v. Elstad, 470 U.S. 298, 318 (1985); United States v. McCurdy, 40 F.3d

1111, 1116 (10th Cir. 1994).  In such situations, the "totality of the circumstances" test requires courts to examine whether there is a break in time and circumstances between an illegally obtained statement and a subsequent statement that police obtain after they advise a defendant of his <u>Miranda</u> rights.  <u>See</u> <u>United States v. McCurdy</u>, 40 F.3d at 1117.

## LEGAL ANALYSIS

The parties do not dispute that Torres-Castro had a legitimate expectation of privacy in the portions of the residence where the police arrested him and found the shotgun.[7]  At the suppression hearing, however, Torres-Castro's counsel conceded that Torres-Castro voluntarily consented to the officers' initial entry into the residence's living room and that the officers had probable cause to arrest Torres-Castro at the time they entered the residence and identified Torres-Castro as the subject of the juvenile's allegations.  <u>See</u> Transcript of Hearing at 76:22 - 77:11.  In addition, Torres-Castro has not specifically challenged whether Ortega obtained his subsequent statements in violation of his <u>Miranda</u> rights.

The disputed issues which require further analysis are whether the protective sweep was incident to Torres-Castro's arrest, and whether any violation of Torres-Castro's Fourth Amendment rights that occurred during the protective sweep tainted subsequently obtained evidence or statements. The Court's analysis of the latter issue necessarily requires consideration whether Torres-Castro's statement identifying the location of the shotgun and his consent to the search the residence for weapons were voluntary, and whether the police obtained his statement identifying the shotgun's location in violation of his <u>Miranda</u> rights.

---

[7] The United States' response brief does not challenge Torres-Castro's standing, and Torres-Castro testified at the suppression hearing that the bedroom where the officers found the shotgun and ammunition was his bedroom.  <u>See</u> Transcript of Hearing at 69:25 - 70:9.

With respect to these disputed issues, the Court concludes that the protective sweep was not incident to Torres-Castro's arrest and that it therefore cannot justify the sweep under the doctrine articulated in Maryland v. Buie, 494 U.S. at 333-34.  The Court also concludes, however, that the protective sweep did not taint any of the subsequently obtained evidence or statements because the officers possessed probable cause to arrest Torres-Castro and question him about the presence of weapons based on evidence from independent sources that they obtained before the protective sweep; Torres-Castro voluntarily consented to the officers' entry into his residence such that the officers were lawfully in a position to arrest and question him before the sweep of the residence's other rooms.  In addition, the Court concludes that Torres-Castro's self-incriminating statements to the officers and his consent to search the residence for weapons were voluntary, and that the police did not obtained them in violation of his Miranda rights or by unlawful exploitation of the information obtained during the protective sweep.

I.     **TORRES-CASTRO KNOWINGLY AND VOLUNTARILY CONSENTED TO THE OFFICERS' ENTRY INTO THE RESIDENCE, AND THE OFFICERS HAD PROBABLE CAUSE TO ARREST HIM UPON THEIR ARRIVAL.**

Relevant law and the facts support the concessions of Torres-Castro's counsel regarding probable cause and consent to enter the residence.  In particular, the Court concludes that Torres-Castro's consent to the officers' initial entry into the residence's living room was knowing and voluntary.  The Fourth Amendment does not prohibit police officers from seeking to interview Torres-Castro at his residence in response to the juvenile's allegations, and the interview began as a consensual encounter.  See United States v. Abdenbi, 361 F.3d at 1288; United States v. Daoust, 916 F.2d at 758.  The officers did not draw their weapons, use physical force, or engage in any threatening or deceptive behavior to gain entry into the residence.  Rather, the officers asked for

permission to enter and identified the visit's purpose in a manner that Torres-Castro understood.[8]

Once Torres-Castro gave his consent to the officers' entry into the portion of the residence where

he was standing, the officers could lawfully arrest and question him at that location without a warrant,

provided that the arrest was supported by probable cause. See United States v. Hampton, 260 F.3d

at 835.

To establish probable cause for Torres-Castro's arrest, the officers were entitled to rely on

the alleged crime victim's report, which Phel's observations, interview with the juvenile's mother, and

check of police records--including the police photograph of Torres-Castro--corroborated in

significant respects. Under these circumstances, the information previously obtained by Phel was

reasonably trustworthy enough to establish probable cause for a warrantless arrest upon the officers'

arrival at the residence. See Baptiste v. J.C. Penney Co., 147 F.3d at 1259. The police identified

Torres-Castro as the subject of the juvenile's allegations based on the officer's observations through

the open picture window before their arrival and when Torres-Castro opened the front door to greet

them.

The officers did not need to rely on other evidence obtained after their initial entry into the

residence to establish probable cause for Torres-Castro's arrest because the information

independently obtained by Phel was sufficient for this purpose. Further, it does not matter whether

the officers had probable cause to arrest Torres-Castro for the crime for which the federal grand jury

eventually indicted him, so long as they had probable cause to believe he had committed some crime

for which a warrantless arrest is justified. See United States v. Edwards, 242 F.3d at 935. In United

---

[8] While Torres-Castro testified that his primary language is Spanish, he also testified that he understands some English, and that he understood the officer's request to come inside the residence to talk to him. See Transcript of Hearing at 58:1-4; 66:19-22.

States v. Edwards, the Tenth Circuit acknowledged that there are circumstances in which police officers have probable cause to believe that a suspect committed at least one of several possible offenses, but do not yet have enough details to determine the exact offense with which they will later charge the suspect.  See id.

In accordance with the principle that probable cause is an objective standard that does not depend on an individual officer's subjective beliefs, see United States v. Davis, 197 F.3d at 1051, the Tenth Circuit also has acknowledged circumstances in which there is probable cause to support an arrest on a particular charge even though the arresting officer is unaware of that particular charge or does not subjectively believe probable cause exists, see United States v. Santana-Garcia, 264 F.3d at 1192 (citing Florida v. Royer, 460 U.S. at 507).  In United States v. Santana-Garcia, for example, the Tenth Circuit concluded that, "regardless of his subjective belief that he had no authority to arrest Defendants, [the officer] had probable cause to arrest both Defendants for suspected violation of federal immigration law."  Id. at 1193.

The crimes the officers were investigating when they arrived at Torres-Castro's residence are felony offenses which may justify a warrantless arrest.  Under New Mexico law, for example, criminal sexual penetration of a child between thirteen and sixteen years of age is a fourth-degree felony.  See NMSA 1978, § 30-9-11(F)(1) (2004).  False imprisonment is a fourth-degree felony.  See NMSA 1978, § 30-4-3 (2004).  A first offense consisting of abuse of a child that does not result in the child's death or great bodily harm is a third-degree felony.  See NMSA 1978, § 30-6-1(D) (2004).  Contributing to the delinquency of a minor is a fourth-degree felony.  See NMSA 1978, § 30-6-3 (2004).

Thus, even assuming that the officers lacked probable cause or authority to arrest Torres-Castro for an offense involving his immigration status or federal firearms violations, they nevertheless had probable cause to arrest Torres-Castro for one or more felony offenses listed in New Mexico's Criminal Code based on the information obtained from the juvenile and her mother, and on Phel's own observations of the juvenile running down Central Avenue in a panic in the middle of the night. That the officers later obtained further details about the length of the shotgun and Torres-Castro's immigration status to support the charges for which the federal grand jury indicted him does not diminish their earlier determination of probable cause regarding other charges.  Further, Phel testified that he charged Torres-Castro with two offenses relating to the alleged mistreatment of the juvenile, in addition to the weapons charge.  See Transcript of Hearing at 21:17-23; 24:14-23.  Accordingly, the officers acted lawfully in entering Torres-Castro's residence and later placing him under arrest in that location.

## II.   THE PROTECTIVE SWEEP WAS NOT INCIDENT TO TORRES-CASTRO'S ARREST.

In between the time that the officers first entered the residence's living room and the time that Torres-Castro was formally placed under arrest, Elrick and Guevara conducted a brief visual inspection of the residence's other rooms.  Torres-Castro contends that this brief "protective sweep" violated the Fourth Amendment, because it was not incident to his subsequent arrest and did not fall within the parameters articulated in Maryland v. Buie, 494 U.S. at 333-34.

To support his assertion that the protective sweep violated the Fourth Amendment, Torres-Castro cites a recent unpublished Tenth Circuit order and judgment.  See United States v. Garza, No. 04-4046, 2005 WL 237757 (10th Cir. Feb. 2, 2005) (unpublished decision).  According to Torres-

Castro, United States v. Garza stands for the proposition that a protective sweep "may only be performed incident to an arrest." Id. at *3. Under 10th Cir. R. 36.3, an unpublished order and judgement is not binding precedent, and its citation is disfavored. Nevertheless, the Court agrees that the proposition for which Torres-Castro cites Garza is a correct statement of current precedent in the Tenth Circuit. The Honorable Judge Timothy M. Tymkovich filed a special concurrence in which he noted the presence of conflicting authority in another circuit, see id. at *6 (Tymkovich, J., concurring) (citing United States v. Gould, 364 F.3d 578 (5th Cir. 2004)). While Judge Tymkovich's and the United States Court of Appeals for the Fifth Circuit's reasoning has considerable force, the presence of Judge Tymkovich's separate opinion underscores that this reasoning is not yet Tenth Circuit law. This Court, being a district court, must follow current Tenth Circuit law, even if there may be good reasons for a different rule.

The Tenth Circuit has emphasized in a published opinion that a "protective sweep" is "'a quick and limited search of premises, *incident to arrest* and conducted to protect the safety of police officers or others.'" United States v. Davis, 290 F.3d at 1242 n.4 (10th Cir. 2002) (quoting Maryland v. Buie, 494 U.S. at 327) (Tenth Circuit supplied emphasis). The protective sweep at issue in United States v. Davis was not incident to arrest because "no one was under arrest" and "there was no probable cause to arrest anyone" at the time the police entered Mr. Davis' home. Id.

The present case is distinguishable from United States v. Davis and United States v. Garza because it is undisputed that Torres-Castro consented to the officers' entry into the portion of the residence where he was located, and the officers had probable cause to arrest Torres-Castro based on information they had collected from independent sources before they conducted the protective sweep. United States v. Garza and United States v. Davis each involved circumstances where the

officers did not have consent to enter the area of the dwelling from which the police seized the defendant and the incriminating evidence, and the officers relied on these seizures to establish probable cause for the arrest.

Unlike Torres-Castro, "Mr. Davis refused the officers' request to enter the home," and another occupant also "refused to consent to a search of the house." United States v. Davis, 290 F.3d at 1241.  Unlike the officers in this case, the officers in United States v. Davis entered Davis' residence without his consent, observed marijuana during their initial protective sweep of the residence, and used this observation as the basis for establishing probable cause to obtain a search warrant for the residence.  See id.

Unlike Torres-Castro, Garza specifically "decline[d] a consensual encounter with police" from behind the closed door of "a bathroom (one of the most private rooms in a dwelling)."  United States v. Garza, 2005 WL 237757, at *4.  Unlike the officers in this case, the officers in United States v. Garza opened the door and entered the bathroom without Garza's consent, and they relied on that entry as the basis for seizing both Garza and the incriminating evidence he possessed in that location.

Despite these distinctions, Torres-Castro asserts that the protective sweep in this case was not "incident to an arrest" because the officers did not subjectively intend to arrest Torres-Castro when they arrived at the residence, and they did not arrest him until some minutes after the protective sweep had occurred.  The officers' subjective intent, however, is not relevant for purposes of establishing the timing of the arrest in relation to the protective sweep.  See United States v. Anchondo, 156 F.3d at 1045.  Applying the general principle that the reasonableness of a search is to be determined by an objective standard, the Tenth Circuit has held that "[w]hether or not the

officer intended to actually arrest the defendant at the time of the search is immaterial" in determining whether the search is incident to the arrest.  United States v. Anchondo, 156 F.3d at 1045.

That the protective sweep preceded the arrest is also not dispositive.  see United States v. Lugo, 170 F.3d at 1003.  "Where the formal arrest followed quickly on the heels of the challenged search," it is not "particularly important that the search preceded the arrest rather than vice versa," so long as the officers are not relying on the evidence discovered during the search to establish probable cause for the arrest.  Rawlings v. Kentucky, 448 U.S. 98, 111 (1980).

Nevertheless,  the Court concludes that the protective sweep did not fall within the temporal parameters of a search incident to arrest because of the presence of intervening events.  One or more of the APD officers placed Torres-Castro under arrest when they took him to one of the bedrooms and handcuffed him.[9]  Although it is possible that the officers may have conducted a brief pat-down search of the male occupants in the living room before isolating Torres-Castro in the bedroom, such a pat-down search is more indicative of a brief, investigative detention rather than a full custodial arrest.  See Oliver v. Woods, 209 F.3d at 1186.  Indeed, Torres-Castro may have consented to a pat-down search and was not handcuffed or isolated in a separate room in conjunction with such a pat-down search.  See Transcript of Hearing at 13:13 -14:4; 43:25 - 44:18; 47:8-16; 55:15-18.  Thus, the confinement and handcuffing in the bedroom, rather than the pat-down search, constituted the arrest.

---

[9] The Court's analysis is premised on its findings that the officers credibly testified as to the timing of the actual arrest and that Torres-Castro's testimony to the contrary at the suppression hearing was not credible insofar as he contended the officers physically restrained and handcuffed him immediately upon their entry into the residence.  If the Court credited Torres-Castro's testimony  as to these events or took it as a binding admission, it would establish that Phel placed him under arrest almost simultaneously with the protective sweep Elrick and Guevara conducted.  Thus, the temporal requirements for a protective sweep would be satisfied under this scenario, and there would be no Fourth Amendment violation upon which Torres-Castro could premise his suppression argument.

Between the time the police completed the protective sweep and the time of Torres-Castro's arrest in the bedroom, the following intervening events occurred:  (i) while Torres-Castro remained in the living room, and the other occupants assembled there, Guevara briefly questioned each of them regarding their knowledge of weapons in the residence and their consent to search the residence for weapons; (ii) before the officers physically restrained Torres-Castro or directed him to go to the bedroom, he responded to Guevara's questions by acknowledging the presence of a shotgun in the residence, identifying its location, and consenting to a search of that location; and (iii) upon receiving this information from Torres-Castro, Guevara went into the front bedroom, observed the shotgun under the mattress, and returned to the living room to continue questioning Torres-Castro.  These events suggest that the atmosphere in the residence retained the character of a consensual encounter for a significant period after the police completed the protective sweep.  See Transcript of Hearing at 43:20 - 47:19; 55:15-18.

In particular, the Court notes that the officers had already located Torres-Castro before commencing their protective sweep, and all the occupants were cooperative in assembling in the living room per the officers' request.  While the officers may have been justified in taking the actions necessary to gather the other occupants in the living room where Torres-Castro was already present, these actions were quite minimal in light of the occupants' cooperation, and the officers did not immediately place Torres-Castro under arrest after completing these actions.  Thus, this case is not one in which the officers were delayed in effecting an arrest because of any resistance encountered during the protective sweep.

Rather, this case presents circumstances in which the officers, upon completing the protective sweep, elected to resume their consensual encounter with Torres-Castro and see what additional

-34-

information he might voluntarily provide.  This continuation of the consensual encounter and the voluntary nature of the additional questioning indicates an intervening act that provides a break in the sequence of events leading to the arrest.  Accordingly, the Court cannot justify the officers' protective sweep as a search incident to Torres-Castro's arrest.

In reaching this conclusion, the Court does not rely on the length of time that passed between the protective sweep and the arrest, nor does the Court rely on any finding that the officers exceeded the spatial parameters of a protective sweep.  On the contrary, the Court acknowledges that there is no specific, quantifiable time limit governing a search incident to arrest, see, e.g., United States v. Lugo, 170 F.3d at 1003, and in this case, the physical configuration of the residence could, under certain circumstances, present a danger to the officers or others at the scene.  In contrast to the bright-line rule that applies to searches of vehicles incident to an arrest, see id. at 1003 (citing New York v. Belton, 453 U.S. 454, 460 (1981)), the spatial parameters of a protective sweep of a residence must be examined on a case-by-case basis to determine from which portions of the residence immediately adjoining the arrest an attack could  immediately be launched, and whether the arresting officers had grounds to reasonably suspect an individual who poses a danger to those on the arrest scene may be harbored in any additional areas.  See Maryland v. Buie, 494 U.S. at 333-34; United States v. Cavely, 318 F.3d at 995-96.

In this case, the open closet where Elrick observed the shotgun shells was located adjacent to the door which led from the front bedroom of the residence to the living room area where Torres-Castro and other individuals were standing at the time of the protective sweep.  Further, the door to that front bedroom was located directly around a blind corner that the officers could not see from their vantage point within the living room.  See Defendants Exhibits 1, 2; Transcript of Hearing at

21:3-6; 29:9 - 30:5; 32:25 - 33:3; 42:16 - 43:19; 45:19 - 46:4.  Thus, the shotgun shells in the open

closet would have been within arms reach of a person standing in the threshold of the door to the

front bedroom, directly around the blind corner from the living room.

Given that there are numerous legitimate and lawful reasons for storing a firearm in one's

residence, information regarding the mere presence of a firearm in a home cannot provide the sole

basis for a protective sweep.  When combined with information indicating that an occupant has

threatened to use the firearm in a violent and unlawful manner, however, officers may possess a

reasonable suspicion that such an occupant lurking in the residence presents a danger to those at the

arrest scene.  See,  e.g., United States v. King, 222 F.3d at 1284-85.  In this case, one or more of the

officers were aware that Torres-Castro had a gun and that he had previously threatened to shoot

anyone who attempted to take the juvenile away from him.

Although the officers had no specific information that any of the other occupants were violent

or dangerous, the officers did have more than a reasonable suspicion that other occupants were

present in the areas of the residence that the protective sweep covered because the officers testified

that they actually saw other individuals moving in or toward those areas of the residence.  Guevara

testified that one of the individuals looked out at the officers through the picture window as they

approached, said something to the other occupants, and then some of the occupants began to move

toward the back of the residence.  Guevara also testified that he could see people moving in the back

bedrooms or their vicinity from his vantage point in the living room.  Thus, this case is not one in

which the officers were relying on mere speculation that another person might be in the residence.

The above information could have perhaps supported a protective sweep if, upon its

completion, the officers had proceeded to arrest Torres-Castro in one continuous sequence of events.

They did not do so, however, and instead elected to resume their consensual encounter with Torres-Castro for a significant period before they moved him to another room and placed him under arrest. The intervening events occurring during this prolonged consensual encounter preclude the Court from reaching the conclusion that the protective sweep was incident to Torres-Castro's arrest.

## III.   THE PROTECTIVE SWEEP DID NOT TAINT TORRES-CASTRO'S STATEMENT OR HIS CONSENT TO SEARCH THE RESIDENCE FOR WEAPONS.

Torres-Castro asserts that the protective sweep's illegality taints any incriminating statements he made regarding the location of the shotgun, as well as any consent he gave to search the residence for weapons.  While the Court concludes that the protective sweep cannot be justified on the grounds that it was incident to Torres-Castro's arrest, it does not necessarily follow that the Court must suppress pursuant to the exclusionary rule his subsequent statements to police, or any evidence obtained as a result of those statements or his consent to search the residence.  To obtain the suppression of such evidence under the "fruit of the poisonous tree" doctrine, Torres-Castro also must meet his burden of showing that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."  United States v. Nava-Ramirez, 210 F.3d at 1131.

The unconstitutional conduct at issue here is the officers' protective sweep of the residence, not Torres-Castro's arrest.  The arrest itself occurred after the protective sweep, and the officers already had probable cause to arrest Torres-Castro, as well as his consent to enter the residence, without relying on any information gleaned from the protective sweep.

In these respects, this case is distinguishable from those in which an illegal arrest precedes the defendant's statements or consent to search.  Where the unconstitutional conduct is an illegal arrest,

the requisite factual nexus is more easily demonstrated, because the officers would not have been in a position to question the defendant but for the fact that he or she was under arrest.  In those circumstances, the burden shifts to the government to demonstrate both "the voluntariness of the consent under the totality of the circumstances" and "a break in the causal connection between the illegality and the evidence thereby obtained."  United States v. Melendez-Garcia, 28 F.3d at 1053 (internal citation and quotation marks omitted).  Such an obvious factual nexus is lacking here, because an illegal arrest did not precede Torres-Castro's statement and his consent to search.

This case is also distinguishable from other scenarios in which the police must necessarily rely on evidence or persons discovered during a search to establish probable cause to support an arrest or a subsequent, more detailed search.  In United States v. Davis and United States v. Garza, for example, there was a factual nexus between the unlawful search of a dwelling (or portion thereof), and the seizure of the evidence and persons discovered during that unlawful search.  United States v. Davis and United States v. Garza each involved the government's attempt to justify a search as a "protective sweep" after individuals with a legitimate expectation of privacy in the area to be searched specifically declined the officers' requests for consent to search that area.  See United States v. Davis, 290 F.3d at 1241; United States v. Garza, 2005 WL 237757, at *4.  In addition, the officers in United States v. Garza and United States v. Davis relied on the evidence or persons seized during their protective sweeps to establish probable cause for arresting those persons or conducting a subsequent search.  See United States v. Davis, 290 F.3d at 1241; United States v. Garza, 2005 WL 237757, at *1-2.

This case presents a different scenario, because here, the officers had both probable cause to arrest Torres-Castro and his voluntary consent to enter the portion of the residence where he was

located before the protective sweep occurred.  The officers did not seize evidence during the

protective sweep, and they did not locate the sawed-off shotgun that forms the basis for the pending

firearms charges during the protective sweep.  Moreover, the officers did not need to rely on the

evidence obtained as a result of the protective sweep as the basis for establishing probable cause to

effect Torres-Castro's arrest, or as the basis for their further search of the residence.  Rather, the

officers relied on Torres-Castro's voluntary consent to enter the residence to effect the seizure of his

person, and they could rely on evidence from independent sources (namely, the juvenile, her mother,

and police records) to establish probable cause for his arrest.  See Segura v. United States, 468 U.S.

at 813-14.

      For these reasons, the connection between the unconstitutional conduct and the evidence or

statements Torres-Castro seeks to suppress in this case is weaker than the connection the Tenth

Circuit found in cases such as United States v. Garza or United States v. Davis where police seize

persons subject to arrest and incriminating evidence during the unlawful search itself, or in cases such

as United States v. Melendez-Garcia, where an illegal arrest, rather than an illegal search, precedes

the incriminating statements or evidence at issue.  In contrast to those cases, Torres-Castro's "fruit

of the poisonous tree" argument essentially boils down to the assertion that, but for the protective

sweep, the officers would not have asked him about the presence of a shotgun or other weapons in

the residence, and would not have requested his consent to search the residence for weapons.

      The Tenth Circuit has rejected similar arguments in several published opinions.  Most recently,

it addressed the argument in United States v. Williams.  See id., 356 F.3d at 1273.  There, the Tenth

Circuit reasoned that an illegal search's effect on an officer's motives for questioning a defendant did

not establish the factual nexus necessary to invoke the "fruit of the poisonous tree" doctrine.  "Even

if the police were motivated to request permission to search by information gleaned through an illegal search, such conduct does not fall afoul of the Fourth Amendment." Id. at 1273.  "'The request itself, even if motivated by the fruits of the prior illegality, is not exploitation'" for Fourth Amendment purposes.  Id. (quoting United States v. Carson, 793 F.2d 1141, 1149 (10th Cir.1986)).

Similarly, the Tenth Circuit has concluded that the requisite factual nexus between an unlawful search and the seizure of a shotgun was lacking where the officers established probable cause for a search warrant based on independent sources (including the defendant's own admissions) rather than their observations during an earlier protective sweep, and the other information available to the officers was sufficient to establish probable cause even if the court excluded the results of any questioning related to the protective sweep.  See United States v. King, 222 F.3d at 1285-86 & n.4. United States v. King is one of several cases in which the Tenth Circuit has concluded that there was no factual nexus linking an unlawful protective sweep to a subsequent search or seizure where the officers did not seize evidence during the protective sweep and did not necessarily rely on information obtained during the sweep to establish probable cause for the subsequent search or seizure.  United States v. Hutchings, 127 F.3d 1255, 1259 (10th Cir. 1997) ("[E]ven if we were to find that this brief entry was unjustified, there is no evidence to be suppressed as a result."); United States v. Hogan, 38 F.3d 1148, 1151 (10th Cir. 1994) ("It appears that the officers gained nothing during the protective sweep that tainted the subsequent warrant."); United States v. Occhipinti, 998 F.2d 791, 800 (10th Cir. 1993) (concluding that a motion to suppress was unfounded where "[t]he officers neither removed any objects that appellant seeks to suppress nor used any information gathered during the sweep as the basis for the search warrant of the house").

Based on these authorities, the Court concludes that Torres-Castro has not shown the factual nexus necessary to invoke the "fruit of the poisonous" tree doctrine. Torres-Castro devotes only two conclusory sentences at the end of his motion to addressing the requirements of the "fruit of the poisonous tree" doctrine, and they contain no citation to authority or supporting facts.

According to the testimony presented at the suppression hearing, the only potentially incriminating evidence that became known to the officers as a result of the protective sweep was the box of shotgun shells observed in the front bedroom's open closet.[10] Elrick credibly testified, however, that he did not remove the shotgun shells from the closet where he first observed them and did not take them out to the living room where Torres-Castro was located. Thus, the police did not seize the shotgun shells during the protective sweep. Rather, the police left the shells in the same location where they could be readily observed and inevitably discovered during the officers' subsequent, consensual search of the front bedroom for weapons.[11]

In addition, the officers had independent grounds for asking about a gun in the residence or requesting to search for a gun in the residence based on the information obtained from the juvenile, who specifically reported that Torres-Castro had a gun and that he threatened to use it if anyone tried to take her away from him. The officers credibly testified that before the protective sweep, they

---

[10] The Court also notes that the police discovered the juvenile in the residence's kitchen area. The parties do not attach any particular significance to this fact, however, and the record is silent whether the reasons for her presence were innocent or potentially incriminating.

[11] Insofar as they would have been inevitably discovered in plain view during the consensual search of the bedroom, the inevitable discovery exception applies to the shotgun shells. See generally Nix v. Williams, 467 U.S. at 443; United States v. Tueller, 349 F.3d 1239, 1245-46 (10th Cir. 2003); United States v. Griffin, 48 F.3d 1147, 1150-51 (10th Cir. 1995). In any event, the suppression of the shotgun shells would have no impact on the admissibility of the sawed-off shotgun itself or Torres-Castro's self-incriminating statements.

already suspected the presence of a gun in the residence and were concerned about his alleged threat to use it against anyone who tried to take the juvenile away from him.  Phel testified that he knew Torres-Castro possibly had a shotgun or some type of weapon, see Transcript of Hearing at 19:3-6, but that he did not know it was illegal for Torres-Castro to possess ammunition and did not arrest him for the shotgun shells, see id. at 21:9-15.  Guevara testified that Phel told him of the juvenile's allegation that Torres-Castro possibly had a sawed-off shotgun or a shotgun at his house, see id. at 38:10-15, and that his questioning of Torres-Castro was based on "officer safety issues" rather than "conducting a particular criminal investigation," see id. at 45:5-13.  Thus, the officer's pre-existing suspicions might have prompted their questioning on this topic even if they had gleaned no additional information from the protective sweep.

In the context of traffic stops, the Tenth Circuit has concluded that officers need not possess specific grounds for asking vehicle occupants about the presence of weapons.  See Holt, 264 F.3d at 1226.  Given the Supreme Court's observation that "[t]he risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter," Maryland v. Buie, 494 U.S. at 333, questioning about weapons should also be permissible in the residential context regardless of the officer's subjective fears or motives. Moreover, to the extent that the officers are involved in a consensual encounter rather than an arrest, the Fourth Amendment is not implicated, and they need not possess any specific grounds for their questioning.  See United States v. Daoust, 916 F.2d at 758; Oliver v. Woods, 209 F.3d at 1186.

While it is possible that Elrick's discovery of the shotgun shells could have prompted the other officers to use the specific term "shotgun" in addition to a generic term such as "weapon" or "firearm" in their questioning of Torres-Castro, it does not necessarily follow that Torres-Castro

understood their use of the more specific term or that the reference to this specific term influenced him.  At the suppression hearing, Torres-Castro testified that he understood the officers to be asking him in Spanish about a "cuete" (meaning "like a weapon"), and the witnesses used the words "weapon," "shotgun," and "gun" interchangeably at the hearing.  See Transcript of Hearing at 13:13 - 14:4; 19:3-6; 44:19 - 45:4; 45:19-23; 47:8-16; 58:19 - 59:3; 63:11 - 64:8; 65:3-6; 69:13-18.  While it is possible that the officers used a suggestive or accusatory tone in some of their questioning, the Court concludes that there was not such an inordinate focus on the discovery of the shotgun shells as to make this discovery a "but for" cause of the officer's questions, much less a cause of Torres-Castro's response or his consent to search.[12]

The officers had already located Torres-Castro before the protective sweep, and they did not conduct the search revealing the sawed-off shotgun until they had obtained a statement from him identifying its location, as well as his consent to search that location.  Because neither Torres-Castro nor the shotgun were located or seized during the protective sweep, and the information obtained during the protective sweep was not a "but for" cause of these seizures, Torres-Castro has not met his burden of establishing the requisite factual nexus between the protective sweep and the evidence he seeks to suppress.  It follows that the "fruit of the poisonous tree" doctrine does not provide a basis for the Court to suppress the evidence or statements.

---

[12] In the next section of this Memorandum Opinion and Order, the Court will address in further detail whether the possible use of a suggestive or accusatory term such as "shotgun" has any bearing on the voluntariness of Torres-Castro's statement identifying the shotgun's location or his consent to search that location.

## IV.   TORRES-CASTRO'S STATEMENTS WERE VOLUNTARY, AND HE VOLUNTARILY CONSENTED TO THE SEARCH OF THE RESIDENCE FOR WEAPONS.

The Court must also analyze whether Torres-Castro's statements and his consent to search were "voluntary" for purposes of the Due Process Clause of the Fourteenth Amendment.  Under the Due Process Clause, the question of voluntariness constitutes an additional inquiry that the Court's analysis of the Fourth Amendment "fruit of the poisonous tree" doctrine and the Miranda warnings required under the Fifth Amendment does not entirely subsume.  See United States v. Dickerson, 530 U.S. at 433 (distinguishing voluntariness test from Miranda requirements); cf. Brown v. Illinois, 422 U.S. at 603-04 (concluding that application of "fruit of the poisonous tree" doctrine to illegal arrest does not rely solely on presence of  Miranda warnings or finding of voluntariness).

The considerations relevant to determining the voluntariness of Torres-Castro's statements and his consent to search overlap to a significant degree with the factors used to determine whether the officer's interaction with Torres-Castro constituted a consensual encounter rather than a seizure of his person.  See United States v. Drayton, 536 U.S. at  206; United States v. Abdenbi, 361 F.3d at 1288, 1291.  As noted in the preceding analysis of the protective sweep, the officers' interaction with Torres-Castro retained the character of a consensual encounter for a significant period of time after the protective sweep was completed.  The occupants of the residence, including Torres-Castro, remained cooperative, and the officers did not draw their weapons or otherwise exhibit a show of force or other threatening behavior.  It was during this time that Guevara asked Torres-Castro in English and in Spanish about the presence of weapons and requested Torres-Castro's consent to search the residence for weapons.

-44-

"An officer's request for consent to search does not taint an otherwise consensual encounter 'as long as the police do not convey a message that compliance with their request is required.'" United States v. McCurdy, 40 F.3d at 1119 (quoting United States v. Griffin, 7 F.3d 1512, 1517 (10th Cir.1993)).  In this case, the police specifically advised Torres-Castro that he was not required to answer Guevara's question about the weapons.  While not mandatory, the presence of such advice is a factor that weighs in favor of a finding of voluntariness.  See United States v. Drayton, 536 U.S. at 206-07.

The court determines the voluntariness of a defendant's consent by examining the totality of the circumstances.  See id.  The Supreme Court and the Tenth Circuit have rejected the proposition that the mere presence of uniformed officers carrying holstered weapons is coercive *per se*.  See id. at 204-05; United States v. Abdenbi, 361 F.3d at 1288.  Rather, the factors that are indicative of involuntariness include:  "[P]hysical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant."  United States v. McCurdy, 40 F.3d at 1119.  In this case, the officers credibly testified that they did not use such coercive or deceptive tactics, and Torres-Castro's testimony to the contrary is not credible.  Guevara questioned Torres-Castro in both Spanish and English to ensure his understanding, and Torres-Castro presented no credible reason--other than his limited command of the English language--to suggest that his mental condition or capacity rendered his actions involuntary.  Further, Torres-Castro remained in an unrestrained position in his own residence with other family members or associates present during Guevara's questioning about the shotgun's presence and location.  These factors also weigh in favor of a finding that Torres-Castro voluntarily consented to the search of the residence and that his statement in response to Guevara's questioning

about the presence of a weapon or shotgun also was voluntary.  See United States v. Drayton, 536 U.S. at 204 (noting that, when other citizens "are present to witness officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police").  Cf. United States v. Rogers, 391 U.S. at 1170 ("[T]he fact that the encounter took place in [the defendant's] residence does not weigh in favor of concluding that he was in custody.").

Finally, the Court considers the impact, if any, that Torres-Castro's awareness or suspicion that the officers possessed evidence which incriminated him--either from the protective sweep, from their possible use of the word "shotgun" when questioning him, or from other sources--might have had on his consent's voluntariness.  In related contexts, the Supreme Court and the Tenth Circuit have specifically rejected the notion that a suspect's awareness that police are in possession of incriminating evidence necessarily defeats a finding of voluntariness.  For example, the Supreme Court has held that a suspect's consent to search was voluntary notwithstanding the suspect's awareness that police had arrested his traveling companion just moments before a police officer asked him for consent.  See United States v. Drayton, 536 U.S. at 205-06.  Similarly, the Supreme Court has concluded that a suspect's knowledge that "the cat was already out of the bag" because he had made an earlier confession before the police gave him Miranda warnings did not necessarily taint statements the police later obtained pursuant to the suspect's waiver of his Miranda rights.  See Oregon v. Elstad, 470 U.S. at 318.  In such circumstances, "the causal connection between any psychological disadvantage created by his [prior] admission and his ultimate decision to cooperate is speculative and attenuated at best."  Id. at 313-14.

More recently, the Tenth Circuit concluded that a suspect's recognition that a drug detection dog was "sniffing" him, and the accusatory manner in which officers spoke with him after the dog

-46-

alerted, did not change the situation from a consensual encounter to an involuntary seizure.  See United States v. Williams, 356 F.3d at 1274-75.  In reaching this conclusion, the Tenth Circuit noted that "the benchmark for purposes of the Fourth Amendment is the perception of an innocent person." Id. at 1275.  Accord United States v. Drayton, 536 U.S. at 202; United States v. Rogers, 391 F.3d at 1169.  Thus, the relevant question is whether a reasonable *innocent* person would have felt sufficiently accused by such behavior to render his or her subsequent statements or consent involuntary.  The internal psychological pressure associated with a suspect's knowledge of his or her own guilt, or fears that evidence of such guilt has been discovered by police, have no bearing on this question.  See Oregon v. Elstad, 470 U.S. at 313-14; United States v. Williams, 356 F.3d at 1274-75.

Torres-Castro voluntarily gave his statement to Guevara identifying the shotgun's location and his consent to search the residence for weapons.  The statements were not causally connected to the protective sweep's illegality in any meaningful way.  After the protective sweep, the situation in the living room where Torres-Castro was present remained a consensual encounter.  Torres-Castro's subjective awareness or suspicion that the officers might have possessed evidence which incriminated him as a result of the protective sweep--or their use of the word "shotgun"--is not sufficient to establish a causal connection with any unconstitutional conduct and does not render Torres-Castro's actions involuntary.

## V.  GUEVARA DID NOT TAKE TORRES-CASTRO'S STATEMENT IN VIOLATION OF HIS MIRANDA RIGHTS, AND THIS STATEMENT DOES NOT PROVIDE A BASIS FOR SUPPRESSING ANY NONTESTIMONIAL EVIDENCE.

Although Torres-Castro does not specifically raise this argument in his written motion, his counsel's remarks at the suppression hearing suggested that the police violated Torres-Castro's Fifth Amendment rights when Guevara elicited incriminating information from him concerning the

shotgun's location before the police provided him with a complete set of Miranda warnings.  The Court agrees with Torres-Castro that he did not receive all four of the warnings that Miranda requires before this statement was elicited.  See United States v. Dickerson, 530 U.S. at 435 (listing four required elements of Miranda warning).  Rather, Guevara gave Torres-Castro only a small portion of the required Miranda warnings at that time, advising him in English and Spanish that he did not have to answer the officer's question.

It does not follow that the police violated Torres-Castro's Miranda rights, however, because the police did not curtail his freedom of action to a degree associated with a formal arrest at the time Guevara initially elicited the statement about the shotgun's location.  Rather, Torres-Castro remained engaged in a consensual encounter while standing in an unrestrained position in his own residence while other friends or family members were present.  Thus, Torres-Castro was not subject to "custodial interrogation" at that time, and the law did not require the officers to give Miranda warnings at that time.  Under these circumstances, the absence of full Miranda warnings does not provide a basis for suppressing Torres-Castro's statement about the shotgun's location.[13]  See United States v. Rogers, 391 F.3d at 1170-71.

Further, even if the Court had to suppress Torres-Castro's statement itself pursuant to Miranda, the Fifth Amendment does not require the suppression of the shotgun or any other nontestimonial evidence.  See United States v. Patane, 124 S. Ct. at 2630.  Rather, the preceding analysis of Torres-Castro's rights under the Fourth Amendment  and the Due Process Clause of the

---

[13] Because the Court concludes that the police had not yet arrested Torres-Castro and that he was not subject to custodial interrogation at the time he made this statement, it is unnecessary for the Court to address whether that statement also falls under the public-safety exception articulated in New York v. Quarles, 467 U.S. at 655-56, or United States v. Holt, 264 F.3d at 1226.

Fourteenth Amendment, which also reveal no basis for invoking the exclusionary rule as to this evidence, govern the admissibility of such nontestimonial evidence.

## VI.   ORTEGA DID NOT TAKE TORRES-CASTRO'S STATEMENTS IN VIOLATION OF HIS <u>MIRANDA</u> RIGHTS, AND THE PRIOR CONDUCT OF THE APD OFFICERS DID NOT TAINT THESE STATEMENTS.

The parties do not dispute that Ortega gave Torres-Castro <u>Miranda</u> warnings before he questioned Torres-Castro about the offenses for which the federal grand jury indicted him in this case. Thus, <u>Miranda v. Arizona</u> does not provide a basis for the Court to suppress Torres-Castro's subsequent statements to Ortega.  <u>See</u> <u>United States v. Gell-Iren</u>, 146 F.3d 827, 830-31 (10th Cir. 1998).  Neither Torres-Castro's motion, nor the evidence or argument at the suppression hearing, call into question whether the waiver of his <u>Miranda</u> rights was valid with respect to Ortega's questioning.

Even if Torres-Castro's prior statements to Guevara or Phel are inadmissible because of a lack of <u>Miranda</u> warnings, there was a sufficient degree of attenuation between those prior statements and Ortega's custodial interrogation in accordance with <u>Miranda</u> to support the conclusion that Torres-Castro voluntarily gave his statements to Ortega and that the statements do not constitute "fruit of the poisonous tree."  <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. at 318; <u>United States v. McCurdy</u>, 40 F.3d at 1116.  Therefore, the Court will not suppress Torres-Castro's statements to Ortega.

The Court concludes that the United States has met its burden of proving that the officers entered Torres-Castro's residence with his voluntary consent, had probable cause for conducting a warrantless arrest of Torres-Castro based on information from independent sources, and obtained statements and consent to search from Torres-Castro which were voluntary and did not violate his <u>Miranda</u> rights.  While the officers' protective sweep was unlawful because it was not incident to Torres-Castro's arrest, Torres-Castro has not met his burden of proving a factual nexus between the

protective sweep and any of the evidence he seeks to suppress.  Based on the testimony presented

at the suppression hearing, the Court concludes that such a causal connection is lacking.

Consequently, there is no basis for the Court to suppress the evidence or statements pursuant to the

exclusionary rule.

    **IT IS, THEREFORE, ORDERED** that Defendant Victor Manuel Torres-Castro's Motion

to Suppress Evidence is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
  United States Attorney for the
    District of New Mexico
David M. Walsh
  Assistant United States Attorney for the
    District of New Mexico
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Phillip Medrano
  Assistant Federal Public Defender
Albuquerque, New Mexico

    *Attorney for the Defendant*